GEORGE F. TUTTLE, executor, &c.,

*v.*

FELIX M. WOOLWORTH et al.

[Submitted March 19th, 1908.    Decided April 4th, 1908.]

1. A testator, by his will, gave and devised to his executors and trustees certain portions of his estate in trust, the use and income for the benefit of his daughter during her life, and at her death, the principal, for the benefit of her surviving children, and if she should leave none, then, for the benefit of his other children. Prior to the execution of the will this daughter had joined a semi-religious and sociological society, whose members rejected the ideas of the marriage relation prevalent and lawful in this country, and contracted an alliance with a man who became the father of her only child, whom she left surviving and who was born prior to the execution of the will. In a suit brought for the construction of the will and for direction as to the disposition of the *corpus* of the trust fund which was claimed by this illegitimate child, one of the defendants, it appeared from the evidence that the testator knew that his daughter had contracted this illicit alliance with the man who was the father of her child, and that the child which was the fruit of this irregular relationship was illegitimate, and that he was her only child, her only issue, and that this knowledge came to him before the execution of his will.—*Held*, that it must be implied from the terms of the will and the circumstances surrounding its execution that the testator meant that the remainder of the share of his estate in question should go to the then living illegitimate child, or to any other illegitimate children that might be the fruit of her irregular relationship in the society which she had joined.

2. The decision of this point in favor of the defendant claimant has the effect of conferring upon him by necessary implication the title to the estate of which his mother, during her lifetime, received the income.

3. This is in entire consonance with the statutory provisions of this state relating to the devolution of the title to personal property in the case of illegitimates.

4. By the statute of distribution now in force (*P. L. 1898 p. 778*) it is declared that if the mother of any illegitimate child or children shall die without leaving a husband surviving her, and leaving no lawful issue, or the issue of any, then the surplusage of her goods, chattels and personal estate shall be paid to her illegitimate child or children.

5. The question arising out of the claimant's statutory legitimation is not discussed, yet the facts of the case bring it within the principle of certain cases on that subject decided by the courts of this state arising under the statutes of other states.

On final hearing on bill, answers, replication and proofs.

The bill in this case is filed by an executor and trustee; it seeks a construction of the will under which he is acting, and directions as to the disposition of a particular fund remaining in his custody.

The will in question was executed in December, 1871. The testator died in January, 1872. He left three children, all of whom he provided for. It is the bequest in favor of his daughter Caroline which causes the question that is now to be considered.

The testator devised to the trustees, in the first place, a house and lot, which they were directed to permit his said daughter to use and occupy during her natural life, with this direction:

"And after her death to convey the same to her children, or if it shall be deemed more desirable by my executors, and for the interest of said children, then to sell the said house and lot and divide the proceeds thereof among said children, share and share alike, but should the said Caroline die without issue her surviving, then I direct my said executors to sell and convey the said house and lot and distribute the proceeds thereof among her heirs," &c.

The testator likewise gave to his executors and trustees certain bonds and stocks upon the trust that they should collect the income therefrom and use the same for the purpose of paying all expenses incidental to the maintenance of the above-mentioned house and lot, and if there was any balance of the said income remaining unexpended for that purpose, to pay the same to his said daughter during her natural life and upon her separate individual receipt;

"and after her death to set off the said bonds and stock to her children or theirs; if the said Caroline shall die without issue her surviving or children of such issue, then said bonds and stock shall revert to my estate," &c.

The main provision, however, is contained in the twenty-third paragraph of the will. By that he divides his residuary estate into three parts, and devises one of the portions to his executors in trust for the use of his daughter Caroline during her natural life,

"the income of said part to be paid to my said daughter Caroline upon her separate individual receipt; and after her death the principal of said part is to be distributed among her children, if any shall her survive. If she shall leave no child or children surviving or issue of such child or children who shall likewise be entitled, then such part shall go to my son and remaining daughter," naming them.

The testator's daughter Caroline died in 1907, and her life estate being thereby terminated, question has arisen as to the proper disposition of the capital of the fund. This now consists principally of personal property, the only real estate being the single house and lot above mentioned. Some time prior to the execution of this will the testator's daughter Caroline had joined a semi-religious and sociological society, whose members rejected the ideas of the marriage relation which are prevalent and lawful in this country. She there contracted an alliance with a man who became the father of her only child, which child now claims the fund in the hands of the complainant as the child or issue of the testator's daughter Caroline, and as one who comes within the terms of the will as such child or issue. This so-called child, now the claimant of the fund in question, was born in October, 1870, prior to the execution of the will under the terms of which the fund is to be distributed.

Considerable evidence was taken to show the family situation at the time the will was made. It appears that, notwithstanding the unusual course of life which the daughter Caroline had chosen, the friendly and filial relations between her and her father and the other members of the family were never broken. The testator was a man of large wealth and of wide business experience. He was president of a large and successful banking institution, and a man of intelligence and high character. Some correspondence between the father and this daughter is in evidence; it is filled with expressions of respect and affection on the part of both. When her child was born she reported the fact to her father (on November 17th, 1870) by a letter, in which she gave the name of the child's father, and stated that she had given to the child himself for his middle name the family name of the testator's family, and that name the claimant still bears.

It is manifest from the evidence that the testator knew that his daughter had contracted an illicit alliance with the man who

was the father of her child, and that the child which was the fruit of this irregular relationship was illegitimate, and that he was her only child, her only issue, and that this knowledge came to him before the execution of his will. In fact, it appears that he had executed a prior will, which was in force at the time of the birth of the child, and that he destroyed it and executed the present will after that event and after his knowledge of it; and it is claimed, on the part of the claimant, that a proper construction of the document will award to him the whole fund, the income of which was by the will given to the daughter (his mother) for life, for the reason that the testator must by necessary implication have intended to benefit this illegitimate child, there being no legitimate issue to answer the demonstration of the will. The evidence also shows that, prior to the birth of the claimant, his reputed father and his mother maintained their relationship in the society of which they were both members, and that they brought up the claimant as their child and acknowledged publicly his paternity.

In 1879 the reputed father and mother contracted a lawful marriage in the State of Connecticut, in which state they appear to have been at that time domiciled. They subsequently and shortly thereafter removed to the State of New York, and that state became thereafter the domicile of the father, the mother and the child, and continued to be the domicile of the father and mother until their respective deaths, and has continued to be the domicile of the claimant to the present time.

In 1876 the legislature of the State of Connecticut passed an act which provided that, where the parents of children born before marriage should afterwards intermarry and recognize such children as their own, such children should inherit with their other children under the statute of distribution, and should be legitimate. And, in 1895, the legislature of New York passed an act, at which time the father, mother and child were domiciled in the State of New York, which provided that all illegitimate children whose parents had theretofore intermarried, or should thereafter intermarry, should thereby become legitimatized and should be considered legitimate for all purposes. This was amended, in 1899, by providing that an illegitimate child whose

parents had theretofore intermarried, or should thereafter inter-
marry, should thereby become legitimatized and should become
legitimate for all purposes, and entitled to all the rights and
privileges of a legitimate child.

*Mr. Frederick F. Guild,* for the complainant.

*Mr. Alfred S. Skinner,* for the claimant.

*Mr. Henry H. Dawson,* for the defendant Baldwin, executor.

*Mr. Charles G. Titsworth,* for Mrs. Taylor and other de-
fendants.

HOWELL, V. C.

The doctrine of gifts by implication has received some atten-
tion in this court. In *McCoury* v. *Leek,* 14 *N. J. Eq.* (*1 Mc-
Cart.*) 71 (*1861*), it was claimed that a wife took an estate for
life in real estate by implication, and concerning the insistment
Chancellor Green says: "All estates by implication are founded
upon the supposed intent of the testator, and, where implications
are allowed, they must be such as are necessary (or at least highly
probable), and not mere possible implications. 'In construing
a will, conjecture must not be taken for implication, but neces-
sary implication means not natural necessity, but so strong a
probability of intention that an intention contrary to that which
is imputed to the testator cannot be supposed.' " Citing *Coryton*
v. *Helyar, 2 Coxe 340,* and *Wilkinson* v. *Adam, 1 V. & B. 466.*

In the same year, and before the same distinguished judge,
arose the case of *Heater* v. *Van Auken, 14 N. J. Eq.* (*1 McCart.*)
*159* (*1861*), in which the doctrine relating to gifts by implication
was applied to a case where an illegitimate child made claim to a
gift by necessary implication. However, it there appeared that
the testator did not intend to include illegitimate children, and
the operation of the rule was not permitted in favor of the ille-
gitimate.

These two cases refer to *Wilkinson* v. *Adam, 1 V. & B. 422*
(*1812*); *affirmed, 12 Pri. 470 (H. L.).* This is a leading case

in relation to the application of the doctrine to bequests in favor of illegitimate children. There the testator, who was married and had no legitimate children, made a devise to the children which he might have by Ann Lewis, who should be living at his decease. It appeared, by extrinsic evidence, that these children had acquired the reputation of being the children of the testator by Ann Lewis before the date of the will, and two questions arose. One was whether extrinsic evidence was admissible to show the situation of the family and of these children at the time of the making of the will, and, also, whether, if there had been legitimate children, by the same mother, they could take together under the same description, and whether future illegitimate children could take under any description in the will.

Lord Eldon observes that this is the will of a man, married, his wife living at the time, having no legitimate children, but three infants sufficiently proved to be at that time his reputed children by Ann Lewis. The question is, whether those three children, who had gained the reputation of being the children of this testator, previously to the will, can take the property devised by these words, being illegitimate, or whether the construction is not to be such children as he might have by Ann Lewis legally, in case the wife should die and he should marry Ann Lewis, and have legitimate children by her. Evidence was taken with a view to establish, not the contents of the will, but, by something extrinsic, who were intended to be the devisees, the evidence establishing the fact that there were individuals, namely, these illegitimate children, who had gained by reputation the name and character of his children. The evidence was admitted and considered by the lord chancellor, and on the whole case he held that it was impossible that the testator could have meant anything but illegitimate children. The legal principle upon which this decision rests is that of necessary implication.

The case of *Wilkinson* v. *Adam* has had a long history in the English courts. I shall cite only a few of the instances in which its doctrine was applied. It was applied in *Bayley* v. *Snelham, 1 Sim. & St. (1882).* There the testator had contracted a marriage which was void *ab initio.* There was one son of the marriage. The testator by his will gave the residue of his estate "unto and

amongst all and every the child and children or to an only child, as the case might be, of him, the said testator, and his wife, Jane." Sir John Leach held that the child of this void marriage was entitled to the estate.

In *Woodhouselee* v. *Dalrymple, 2 Mer. 419 (1817)*, there was a legacy to the children of the late C. K. who should be living at his, the testator's, decease. C. K. was dead at the date of the will, leaving illegitimate children, of whom three were living at the date of the testator's death, C. K. not having had at the date of the will, or even after, any legitimate children. The three illegitimate children were held to be entitled, and it was likewise declared that it was proper to resort to evidence *dehors* the will for the purpose of ascertaining whether there were any who had acquired the reputation of children and that it was possible for illegitimate children to acquire that reputation.

The doctrine was assented to in *Bagley* v. *Mollard, 1 Rus. & M. 581 (1830)*, by Sir John Leach, then master of the rolls, wherein he declared that wherever the general description of children in a will would include legitimate children, it could not be also extended to illegitimate children, although this latter proposition has been overruled.

In *Laker* v. *Hordern, 1 C. D. 644 (1876)*; *45 L. J. Ch. 315*, the testator by his will gave his property to his wife for her life, and after his death to his daughters in equal shares. Two years before he made his will he had married a woman by whom he had previously had three illegitimate daughters. He never had any other children. Evidence was admitted to show that the testator had always treated these daughters as his children, and that on giving instructions for his will he had said that he had a wife and three daughters. On a bill filed by the daughters against the next of kin it was held by Vice-Chancellor Bacon that the three daughters were entitled to the property.

In the meantime, however, there had arisen the case of *Crook* v. *Hill, L. R. 6 Ch. 311 (1871)*; *40 L. J. Ch. 216*. This case came before the lord justices on appeal from the decision of Vice-Chancellor Stuart. There the testator by his will described his daughter as Mary, the wife of John Crook, and spoke of him as her present husband. The daughter was the sister of the de-

ceased wife of John Crook, and therefore not a lawful wife under the English law. There were children of Mary Crook, by John Crook, living at the date of the will, whom the testator recognized as grandchildren, and Mary Crook had no other children. It was held by Lord Justices James and Melish that in construing a will a gift to children might include a class of both legitimate and illegitimate children, provided you have not expressed in the will a sufficiently strong probability of intention that legitimate children alone shall take. In his opinion, Lord Justice James says: "The rules of law and of construction applicable to this case are, first, that a gift to children means a gift to the lawful issue of a lawful marriage, unless (which is the second rule) there be something which in express terms, or by what had been called 'necessary implication,' shows that the gift is to illegitimate children exclusively or to illegitimate children conjointly with another class of legitimate children. It is agreeable to us to find so clear a rule laid down as to what is meant by 'necessary implication' as that which we find in Lord Eldon's judgment in the case of *Wilkinson* v. *Adam,* that is, that necessary implication in this class of cases, as in every class of cases on the construction of instruments, means, 'not natural necessity, but so strong a probability of intention that an intention contrary to that which is imputed to the testator cannot be supposed.'" These are the very words which are quoted by Chancellor Green in the case of *McCoury* v. *Leek, supra.* This case of *Hill* v. *Crook* went to the house of lords (*L. R. 6 H. L. 265; 42 L. J. Ch. 702*), and was there affirmed on opinions delivered by Lords Chelmsford, Colonsay and Cairns. The following is an extract from the opinion of Lord Cairns: "And what appears to me to be the principle which may fairly be extracted from the cases upon this subject is this, the term 'children' in a will, *prima facie,* means legitimate children, and, if there is nothing more in the will, the circumstance that the person whose children are referred to has illegitimate children, will not entitle those illegitimate children to take. But there are two classes of cases in which that *prima facie* interpretation is departed from. One class of cases is, where it is impossible for the circumstances of the parties, that any legitimate children could take under the bequest. * * * The

other class of cases is of this kind, where there is upon the face of the will itself, and upon a just and proper construction and interpretation of the words used in it, an expression of the intention of the testator to use the term 'children,' not merely according to its *prima facie* meaning of legitimate children, but according to a meaning which will apply to and which will include illegitimate children."

The principle was affirmed in the house of lords in *Seale-Hayne* v. *Jodrell, A. C. 304 (1891)* ; *61 L. J. Ch. 70.* There the testator made specific bequests to certain persons to whom he was not related in any way, but whom he denominated in his will as his cousins. In the residuary clause he gave the remainder of his estate "to be equally divided amongst such of my relatives hereinbefore named as     *     *     *     shall become entitled to a vested transmissible interest" under the terms of the will. And as it was held that the word "relatives" included the persons who were not related to him, but who had been earlier in the will described by him as his cousins.

In *Walker* v. *Lulyens, 2 Ch. 238 (1897)* ; *66 L. J. Ch. 622,* the testator gave the income of personal property to her nieces named, providing that if any of them should die leaving issue, such issue should take the share of the income which the parent would have taken. One of these named nieces went through the form of marriage with the husband of her deceased sister, by whom she had a daughter, Gertrude. In another part of the will Gertrude was spoken of as the daughter of the named niece. It was held that Gertrude, although illegitimate, was entitled to take the share of her mother. The indication of the opinion is that recently a very much broader view has been taken by the English courts with respect to bequests to illegitimate children. Mr. Justice Romer declares that the principle decided in *Bagley* v. *Mollard, supra,* was no longer the law, namely, that whenever the general description of children will include legitimate children, it cannot also be extended to illegitimate children. This enlarges the scope of the word "children" very materially.

These citations will illustrate the tendency of the English law in the direction of upholding bequests by implication to illegiti-

mate children, and indicates to what extent the early cases in our own state above cited will go.

The cases cited on behalf of the claimant on this point are to the same effect, and show that the subject under discussion is viewed in the courts of the several states in much the same light in which it is viewed in England.

A well-considered case is *Elliott* v. *Elliott, 117 Ind. 380 (1888)*; *10 Am. St. Rep. 54,* in which a devise to "my children" was construed to mean the testator's illegitimate children, to the exclusion of his legitimate children by a former wife, it being plain from the surrounding circumstances that such was his intention. *In re Scholl's Estate, 76 N. W. Rep. 616 (Wis.),* it was held that any reasonable evidence that the testator intended to include illegitimates would be sufficient, and particularly where the class, in order to participate, must do so through the mother in the line of descent and not through the father.

When the facts in this case are considered, it is quite evident that the testator meant to make provision for the only child of his daughter who was living at the date of the will, of whom he had any knowledge, or for a class of her children who might be born to her during her association with the society of which she was a member, which membership for ought he knew would continue during the remainder of her life. He could have had in contemplation, under the circumstances disclosed by the testimony, nothing but illegitimate children, because at the time he made his will there was no probability that she would ever be the mother of children born in lawful wedlock. It must therefore be implied from the terms of the will and the circumstances surrounding its execution that the testator meant that the remainder of the share of his estate in question should go to the then living illegitimate child, or to any other illegitimate children that might be the fruit of her irregular relationships in the society which she had joined.

The decision of this point in favor of the claimant has the effect of conferring upon him by necessary implication the title to the estate of which his mother during her lifetime received the income. This is in entire consonance with the statutory provisions of our own state relating to the devolution of the title

to personal property in the case of illegitimates. By the statute of distribution now in force (*P. L. 1898 p. 778*), it is declared that if the mother of any illegitimate child or children shall die without leaving a husband surviving her, and leaving no lawful issue, or the issue of any, then the surplusage of her goods, chattels and personal estate shall be paid to her illegitimate child or children. And it is likewise in accord with what must undoubtedly have been the wish of the mother. And while these notions cannot govern the case, and we must look to the will and the testator's surroundings for his intention, it is quite clear that the trend of the law in our state is in the direction indicated.

Having decided upon the rights of the claimant in such a manner as to give him the estate in question, it is unnecessary to discuss the questions arising out of his statutory legitimation; yet it may be said that the facts in the case bring it within the principle of the case of *Dayton* v. *Adkinson, 45 N. J. Eq. (18 Stew.) 603*, a case which depended upon legitimation under a Pennsylvania statute, and also within the principle of the case *In re Peddie, 20 N. J. L. J. 279*, which arose under the adoption laws of the State of Connecticut.

The result is that there must be a decree awarding the property in question to the claimant.